## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**ARLENE CHAVEZ,**

       **Plaintiff,**

**vs.**                                       **No.  06cv0274 DJS**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL SECURITY,**

       **Defendant.**

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Chavez') Motion to Reverse and Remand for a Rehearing **[Doc. No. 12]**, filed August 7, 2006, and fully briefed on October 10, 2006.  On December 22, 2005, the Commissioner of Social Security issued a final decision denying Chavez' claim for disability insurance benefits and supplemental security income payments.[1]  Chavez seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds that the motion to remand is not well taken and will be DENIED.

---

[1] On June 30, 2006, Plaintiff filed a Notice of New Application [Doc. No. 11].  On October 30, 2006, Plaintiff filed her "Addendum to Plaintiff's Notice of New Application [Doc. No. 17], informing the Court that the Social Security Administration had approved her new applications for Disability Insurance Benefits and Supplemental Security Income payments. Accordingly, the applications at issue in this case concern a closed period of benefits.

# I.  Factual and Procedural Background

Chavez, now forty-five years old (D.O.B. September 8, 1961), filed her application for disability insurance benefits and supplemental security income payments on May 14, 2004 (Tr. 11), alleging disability since April 1, 2001 (Tr. 56), due to fibromyalgia, pain, anxiety attacks, migraine headaches, depression, gastroesophageal reflux disease, and right lower quadrant abdominal pain of unknown etiology.  Tr. 13, 98.  Chavez has a high school education, completed two years of college (Tr. 110), and has past relevant work as an accounts receivable clerk, a credit collections clerk, an administrative office manager, and an officer supervisor.  Tr. 69-75. On December 22, 2005, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding Chavez had "the residual functional capacity (RFC) to perform a full range of sedentary work activities that requires lifting of no more than a maximum of ten pounds at a time, occasional lifting or carrying, prolonged sitting, occasional walking and standing, and a good use of hands and fingers for repetitive hand-finger actions and fine manipulation."  Tr. 15.  Relying on the vocational expert's (VE) testimony, the ALJ found Chavez could perform her past relevant work as an accounts receivable clerk, an administrative officer, and a credit collections clerk.  Tr. 16.  The ALJ further found Chavez' "statements concerning the intensity, duration and limiting effects of these symptoms [were] not entirely credible."  Tr. 16.  Chavez filed a Request for Review of the decision by the Appeals Council.  On March 22, 2006, the Appeals Council denied Chavez' request for review of the ALJ's decision.  Tr. 4.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Chavez seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied correct legal standards. *Hamilton v. Secretary of Health and Human Servs.,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

## III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last

for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse and remand, Chavez makes the following arguments: (1) the ALJ erred in finding her depression, anxiety, and headaches were not severe impairments; (2); the ALJ erred in finding she could perform a full range of sedentary work; and (3) the ALJ erred in finding she was not credible.

## A.  Medical Records

On **June 11, 2003**, Edward C. Paredez, M.D., evaluated Chavez for complaints of dysphagia (difficulty swallowing). Tr. 216-217. Chavez reported having problems swallowing for the past eight months. Dr. Paredez assessed Chavez as having refractory GERD

4

(gastroesophageal reflux disease) symptoms in addition to mild distal esophageal stricture and antral mucosal irregularities.  Tr. 216.  Dr. Paredez recommended an EGD (upper endoscopy– done to examine the esophagus, stomach and the duodenum) and dilatation.  This was done on July 16, 2003.  Tr. 212-215.  The EGD indicated the following: (1) normal hypopharynx; (2) mild strictured region with smooth mucosa in the distal esophagus; (3) hiatal hernia; (4) normal stomach; (5) normal pylorus; (6) normal duodenum.  *Id.*

On **August 12, 2003**, Chavez went to the emergency room at University Hospital with complaints of "mosquito bite left neck."  Tr. 205-209.  Chavez complained of left neck stiffness, headache, and diarrhea.  Tr. 205.  On that day, Chavez reported her "current meds" were Nexium (used in the treatment of GERD), Cozaar (used in the treatment of hypertension), Bextra (non-steroidal anti-inflammatory drug), and over-the-counter Tylenol.  *Id.*  The attending physician noted Chavez was worried about West Nile virus.  Tr. 207.  The physician ordered lab work to rule out West Nile virus.  The discharge notes indicate Chavez' diagnosis was "sore neck."  Tr. 209.  However, the physician directed Chavez to call in five days for the lab results.  The physician prescribed Darvon for pain, ice to the neck, and rest.

On **August 26, 2003**, Chavez underwent a barium video swallow.  Tr. 200.  The results of the test indicated Chavez had "normal swallowing function with all of the various food substances."  *Id.*  Chavez also underwent a speech evaluation by a speech pathologist on the same day, which was also normal.  Tr. 202.

On **October 22, 2003**, Jeffrey Dunkelberg, M.D., evaluated Chavez at the University Hospital's Division of Gastroenterology & Hepatology Clinic.  Tr. 195-199.  Dr. Dunkelberg noted Chavez had a six year history of chronic gastroesophageal reflux disease and a 1-1/2 year

history of progressive dysphagia for solids and then liquids.  Tr. 198.  Chavez offered no

complaints on that day.  Dr. Dunkelberg noted in part:

> To review her work-up, in February of 2003, she had an upper GI with small bowel follow
> through which showed a 1.3 cm distal esophageal stricture between the distal esophagus and
> a large hiatal hernia.  She underwent an EGD after initial evaluation in the GI Clinic on July
> 16th.  The endoscope passed easily and a mild strictured region with smooth mucosa was
> noted in the distal esophagus which was dilated with a Savory dilator from 40 to 45 F and 48
> French.  Antral biopsies were taken which were consistent with reactive mucosal fibrosis.  She
> subsequently underwent a video swallow on August 26th which revealed a normal
> oropharyngeal phase of swallowing. Today, she presents for follow-up.
>
> Her Nexium dose was increased to 40 mg P.O. b.i.d. after her endoscopy and she states that
> she has had near total relief of dysphagia since.  She has been compliant with her behavior
> measures.  She states that she does consume mints and one cup of coffee per day and will use
> two pillows when she sleeps.  She states that she has had one episode of nocturnal reflux since
> her EGD and treatment adjustment, and three weeks ago while in New York, she felt a piece
> of steak catch in her lower esophagus.  Otherwise, she has had no problems at all.  <u>She
> volunteers no complaints today and denies nausea, vomiting, weight change, and
> gastrointestinal bleeding.</u>

Tr. 198 (emphasis added).  Dr. Dunkelberg assessed Chavez as having had "near complete

symptom relief" since her dilations and directed her to return as needed.  Tr. 199.  As previously

noted, the EGD procedure was performed on July 16, 2003.  Tr. 212-215.

On **October 29, 2003**, Chavez had a doppler echocardiogram for evaluation of a heart

murmur.  Tr. 193.  The results were essentially normal except for a "trace mitral regurgitation."

Tr. 194.

On **January 8, 2004**, Chavez went to the emergency room at University Hospital.  Tr.

181-190.  Chavez complained of right lower quadrant abdominal pain.  On that day, Chavez

reported her "current meds" were Nexium, Cozaar, Zoloft (antidepressant), promethazine (used in

the treatment of nausea) and bupropion (antidepressant).  The attending physician assessed

Chavez as "mild distress, no urinary symptoms."  Tr. 183 (emphasis added).  The physician

ordered a CBC with differential, a Chem-10, a pregnancy test, and a pelvic ultrasound.  Tr. 185.

Chavez received morphine sulfate for her pain. The ultrasound indicated Chavez had "[t]wo areas of cystic change in the myometrium of the uterus of unknown clinical significance."  Tr 181-182. The physician discharged Chavez the same day and gave her a prescription for pain medication (Vicodin).

On **January 12, 2004**, Chavez returned to University Hospital for a follow up of her emergency room visit.  Tr. 179.   Dr. Gelgand evaluated Chavez and noted:

> The patient is a 42 year old female who presents to clinic today for a follow up from her emergency room visit.  The patient states that on 12/28 she had some right lower abdominal pain.  She rates this pain as 8/10 in nature.  She says that it is sharp and sometimes dull and constant in duration.  She does not relate this to any activities that she has done in particular, just carrying on her normal daily life.  She does take care of her mother and does have to do some heavy lifting at times.  She states that her pain is no any worse or better with her menstrual cycle.  She has not had irregular periods.  They are every 30 days.  Her last menstrual cycle was 12/15/03 and was normal in duration and flow and cramping and she had started her period again yesterday.  She was seen in the Emergency Room on 1/8/04 who at that time did CBC, Chem-7 and urine which were all negative.  GC and Chlamydia were negative.  A pelvic ultrasound was performed that showed multiple cystic lesions with the greatest being 2 cm in diameter and other multiple leiomas.  No ovarian changes and no evidence of pelvic inflammatory disease on ultrasound, however, they did recommend that the cystic lesion should be further evaluated by CT.

Tr. 179 (emphasis added).  On that day, Chavez reported she was on Nexium 40 mg twice a day, Maxzide 75/50 (diuretic), Zoloft (antidepressant), and Cozaar.  *Id.*  The physical examination indicated no sign of herniation and no pain with palpation.  Dr. Gelgand recommended a CT scan and referred her to the OB/GYN clinic for possible hysterectomy and evaluation of her fibroids. Dr. Gerland also opined it was possible Chavez "pulled a muscle doing a lot of her heavy work" and recommended Chavez "try not to do any heavy lifting."  *Id.* (emphasis added).

On **February 24, 2004**, Chavez was seen at the Gynecology Clinic at University Hospital for complaints of right lower quadrant pain since December 2003.  Tr. 170-174.  Chavez reported she was taking Cozaar, Nexium, hydrochlorothiazide (generic name for Maxzide), Zoloft, and

7

promethazine as needed.  Tr. 170.  Chavez was no longer taking Bextra or bupropion.  *Id.*  The

<u>examination was essentially normal</u> except for focal <u>tenderness</u> over the "right lateral aspect of her

incision."  Tr. 174 (emphasis added).  The attending physician noted the ultrasound and CT scan

of the abdomen and pelvis were normal. The attending physician opined Chavez' pain was "most

likely consistent with interstitial hernia versus abdominal pain from her abdominoplasties, given

the history of increased pain with activity."  *Id*.  The physician suggested an over-the-counter

anti-inflammatory for symptomatic relief and recommended Chavez return to her primary care

physician.

On **February 26, 2004**, a family nurse practitioner evaluated Chavez for complaints of

right lower quadrant abdominal pain.  Tr. 168.  The nurse practitioner noted:

> Recently seen for the last four months for ongoing right lower quadrant abdominal pain that
> is primarily located in the incision line where the scar was for her appendectomy.  She was
> seen in the emergency room on 1/9/04.  At that time they did lab work, CBC, Chem-7, and
> urine, all which were negative.  A GC and chlamydia were negative as well.  A pelvic
> ultrasound was performed that showed multiple cystic lesions with approximate size of 2 cm
> in diameter.  Basically no ovarian changes and no evidence of pelvic inflammatory disease on
> ultrasound. CT with contrast was unremarkable per the patient.  She has no alteration in
> bowel or bladder function.  she has no black colored stools, no bright red blood in stool.  She
> is really kind of frustrated because of the level of pain that she is having in this right lower
> quadrant.  There was a pelvic examination done by GYN and they said it was negative as
> well.  The patient does have a headache and is dizzy.

Tr. 168.  The physical <u>examination was essentially negative</u> except for "pain located in the scar

line of the right lower quadrant of the abdomen."  *Id.* (emphasis added).  The nurse practitioner

prescribed **Percocet** (oxycodone) one or two tablets every six hours <u>as needed</u> for severe pain,

#30, **with no refills** and referred her to Dr. Klein.  *Id.*  The nurse practitioner opined a surgical

consultation was needed to further evaluate the possibility of adhesions related to an old

appendectomy.

8

On **March 3, 2004**, Erika Gelgand, M.D., evaluated Chavez for complaints of right lower quadrant pain.  Tr. 166.  Chavez reported she was on Cozaar, Nexium, Maxide, Zoloft, and Bupropion.  *Id.*  Dr. Gelgand noted:

> The patient is a 42-year-old female who presents to clinic today.  This is one of many presentations to this clinic for right lower quadrant pain.  She has been taking Percocet and Vicodin, Toradol, and Oxycodone for her right lower quadrant pain.  <u>She has had an abdominal Ct and pelvic CT, abdominal ultrasound, pelvic ultrasound, an evaluation for rheumatoid arthritis an systemic lupus erythematosus and all of these tests have proved to be negative.</u>  She does have on CT and pelvic ultrasound a small probable degenerative fibroid of her uterus, however, no other abnormalities are seen.  She still complains of excruciating right lower quadrant pain that is worse when she has activity.  This has been going on for several months and she says that this pain is similar to a pain that she had a couple of years ago where she had a left lower quadrant pain which was the same and which resolved with a "partial tummy tuck" as they were thinking that she might have had a hernia.

Tr. 166.  Chavez requested "a Toradol shot that was given to her last week which was helpful."  *Id.*  Dr. Gelgand agreed to give her one Toradol injection and prescribed Vicodin 10 mg, No. 30.  Dr. Gelgand also referred Chavez to General Surgery for evaluation of a possible hernia and/or laparoscopic exploration.

On **April 10, 2004**, Chavez went to the emergency room at University Hospital.  Tr. 158-165.  Chavez reported right lower quadrant groin pain which she described as chronic.  Tr. 161.  Chavez claimed the pain started December 2003.  Chavez reported her "current meds" were hydrocodone two every 4 hours and Cozaar.  *Id.*  The attending physician ordered an x-ray of the abdomen and chest.  Tr. 158.  The results were "unremarkable."  *Id.*  While at the hospital, Chavez received morphine for the pain and then Percocet (hydrocodone) two tablets every six hours as needed.  Tr. 163.  Chavez was discharged with two Vicodin (hydrocodone).  Tr. 160.

On **April 21, 2004**, Chavez went to University Hospital with complaints of right lower quadrant pain.  Tr. 157.  Chavez reported she was taking Nexiuum, Maxide, Zoloft, Cozaar, and

promethazine.  *Id.*  Chavez reported she had been to the emergency room the weekend of April

10th for the same problem.  Erika Geland, M.D., evaluated Chavez and diagnosed her with

hematuria (blood in the urine).  *Id.*  Dr. Geland ordered a urology evaluation for the hematuria.

Dr. Geland prescribed Trazodone (antidepressant) at bedtime, oxycodone, and increased the

Zoloft from 100 mg to 150 mg.

On **May 14, 2004**, Chavez had an IVP.  The results indicate Chavez' IVP was normal

"except for [Chavez'] inability to completely empty bladder and inadequate evaluation of the

bladder wall."  Tr. 155.

On **May 18, 2004**, Chavez went to University Hospital with complaints of right lower

quadrant pain.  Tr. 149-153.  Chavez informed the physician assistant that her "pain can be very

severe and last up to a couple of hours before improving."  Tr. 153.  Chavez reported she was

taking hydrocodone (Vicodin) 5 mg every 4-6  hours for pain, Cozaar, Nexium, Zoloft, Maxzide,

and promethazine.  Tr. 149.  The physician assistant and a physician evaluated Chavez and found

she did not have a hernia.  On this day, Chavez reported having "right lower quadrant abdominal

pain for the past several months, increased with activity such as walking, climbing, vacuuming the

floor, etc."  Tr. 153.  Chavez rated her pain at an 8/10 level.  *Id.*  The examination revealed no

masses and tenderness in the right suprapubic area with palpation.  Tr. 154.  The attending

physician referred Chavez to the pain clinic.

On **May 24, 2004**, Matthew D. Hoggatt, M.D., performed  a cystocopy for microscopic

hematuria (blood in the urine).  Tr. 147.  Dr. Hoggatt's report indicated Chavez had an

"essentially normal cystoscopy."  *Id.*  Dr. also noted Chavez' had a normal IVP on May 14,

2004." *Id.*  Dr. Hoggatt directed Chavez to return "for a uroflow PVR to evaluate whether she was truly emptying her bladder or not." *Id.*

On **February 1, 2005**, Chavez had a CT scan of the abdomen and pelvis.  Tr. 258.  The CT scan was essentially normal.  Tr. 259.

On **March 31, 2005**, a nurse practitioner at University Hospital evaluated Chavez for "cough, congestion for over a month, wheezing, shortness of breath for a month, and right ear pain."  Tr. 256-257.  Chavez also complained of painful urination. The nurse practitioner listed Chavez' current medications as Cozaar, hydrocodone as needed, Nexium, **Zoloft 100 mg**, promethazine, Maxzide, and methocarbamol (muscle relaxant).  Tr. 256.  The nurse practitioner assessed Chavez with acute bronchitis, hypertension, dysuria (painful urination), and fibromyalgia. The nurse practitioner prescribed an albuterol meter dose inhaler, 2 puffs every 4-6 hours as needed for shortness of breath, antibiotics, and Robitussin AC for her cough.  Tr. 257.

On **June 13, 2005**, Chavez returned to University Hospital with complaints of a chronic cough.  Tr. 253-254.  Chavez' current medications were listed as Vicodin as needed, Cozaar, Nexium, Zoloft 100 mg daily, promethazine, Maxzide, and methocarbamol.  Tr. 253.  Nicole S. Emil, M.D., evaluated Chavez.  Chavez reported she had taken all her antibiotic but continued to have a cough. Chavez also reported her back had been hurting her more than usual.  Chavez described the pain as an "aching type" of pain which she experienced in her back and hip area.  Tr. 253.  Chavez complained that bending or lying on her back aggravated the pain.  According to Chavez, she had been taking pain pills "around the clock without relief."  *Id.*  The physical examination revealed right-sided expiratory wheezing and "tenderness to palpation over the lower

11

lumbar spine with bilateral gluteal tenderness and tight musculature in the paraspinal region."  Tr.

245.  Otherwise, the physical examination was normal.

Dr. Emil assessed Chavez with sinusitis, reactive airway disease, chronic low back pain,

hypertension, depression, fibromyalgia and chronic abdominal pain.  *Id.*  Dr. Emil ordered a chest

x-ray to rule out pneumonia and prescribed antibiotics for ten days.  Dr. Emil also ordered lab

work, CBC (complete blood count) and ESR (sedimentation rate), which were normal.  Tr. 249.

Dr. Emil also prescribed Flovent (steroid) and continued the albuterol.  As to her low back pain,

Dr. Emil noted: "This is chronic and currently acute exacerbation may be secondary to coughing

and acute illness."  *Id.*  Dr. Emil ordered a lower lumbar x-ray to rule out a fracture and referred

Chavez for physical therapy.

Dr. Emil also referred Chavez to the Pain Clinic for assistance with her pain medications.

Dr. Emil noted on the referral slip: "41 year old female with history of chronic low abdominal pain

(full-workup– Colonoscopy, CT, XR, OB/GYN workup– all within normal limits) and chronic

low back pain, has been tx with hydrocodone for many years.[2]  Getting PT.[3]  Please assist with

pain management."  Tr. 251.  Dr. Emil directed Chavez to continue taking methocarbamol

(muscle relaxant) for her fibromyalgia.  Finally, Dr. Emil noted Chavez' history of microscopic

hematuria but opined "no further workup indicated at this time."  *Id.*

---

[2] The record does not support this statement.  According to the medical evidence, Chavez started taking narcotic analgesics on February 26, 2004.  Tr. 168.

[3] The record does not support this statement.  At the August 15, 2005 administrative hearing, Chavez reported she had an appointment to start physical therapy on October 3, 2005. Tr. 285.

On **June 20, 2005**, Dr. Emil ordered a Complete Blood Count.  Tr. 249.  <u>The results were</u>

<u>normal</u>.

On **June 28, 2005**, Chavez had x-rays of the chest and lumbar spine.  Tr. 245-248.  The

chest x-rays indicated there was no radiographic evidence of acute cardiopulmonary disease.  Tr.

245.  The lumbar spine x-rays showed "<u>an essentially unremarkable spine</u>" and "<u>[m]ild</u> thoracic

spine degenerative changes."  Tr. 247 (emphasis added).

On **July 14, 2005**, Chavez returned to the Department of Family & Community Medicine

and consulted Amy L. Robinson, M.D.  Tr. 116-117 (241-242).  Chavez requested her x-ray

results.  Dr. Robinson noted in pertinent part:

> Her <u>chest x-ray is noted to be normal</u> and <u>her lumbosacral spine x-ray is normal with the</u>
> <u>exception of some slight T11, T12 disease which is noted to be minimal</u>.  She states that she
> still has pain in her neck, shoulders, upper and lower back most of the time.
>
> ** ** ** ** **
>
> <u>On physical examination she appears essentially well</u>, however, her blood pressure is 121/78,
> weight 168.7 pounds, temperature 36.5, pulse 100, respiratory rate 16.
>
> ** ** ** ** **
>
> 1.   Fibromyalgia and chronic back pain– for these problems <u>I had encouraged her to call</u>
>      <u>to schedule her physical therapy appointment and to try to be as physically active as</u>
>      <u>possible without overdoing it</u>.  Additionally, I suggested that she try to minimize the
>      use of narcotics as these are highly addictive and may not be contributing to her
>      overall well-being.
> 2.   Chronic rhinitis– for this she will try a  nasal steroid spray.  I gave her a prescription
>      for Rhinocort aqua, however, if this is not covered in the UNM formulary a
>      substitution may be permitted.  We discussed the use of antihistamines and she states
>      that on man occasions she takes a Benadryl tablet at night.  she states that this helps
>      her sleep for  about four hours after which she wakes up with some postnasal drip
>      and slight cough.  I would say that if she does not have adequate relief with her
>      Rhinocort aqua and continues to have a sensation of sinus discomfort it might be
>      worth considering a limited CT scan of the sinuses to rule out chronic sinusitis.
> 3.   Hypertension– this is well controlled today.
> 4.   For follow up I suggested that she call at the beginning of August to schedule an
>      appointment to re-establish a new internal medicine primary care provider in this
>      clinic.

     5.     <u>Occasional headaches</u>– the patient states that she uses promethazine for history of migraine which she describes as a sensation of pain initiated in her shoulders and neck and radiating over the back of her head to her forehead.  She denies any photophobia.  To me this sounds more like a muscle tension headache syndrome, however, this was not thoroughly investigated today as this was not her chief complaint.  It may be worth investigating her headache syndromes in the future.

Tr. 116-117 (emphasis added).

On **August 1, 2005**, Chavez returned to University Hospital.  Tr. 114-115 (239-240 ).

The nurse practitioner evaluated Chavez for lower back pain and muscle spasms.  Chavez denied

any neuropathy to her lower extremities.  The nurse practitioner found as follows:

PAST MEDICAL HISTORY:
Significant past medical history for:
1.     Fibromyalgia.
2.     Chronic back pain.
3.     Seasonal allergies.
4.     Hypertension.
5.     Gastroesophageal reflux disease.
6.     Recurrent headaches.

CURRENT MEDICATIONS:
1.     Vicodin as needed for pain.
2.     Cozaar 50 mg by mouth every day for hypertension.
3.     Nexium 20 mg twice a day.
4.     Zoloft 100 mg by mouth once daily.
5.     Promethazine 25 mg by mouth every 6 hours as needed for nausea associated with headache.
6.     Maxide 75/50, one every day for hypertension.
7.     Methocarbamol muscle relaxant primarily used at bedtime for muscle tightness.
8.     The patient also uses cyclobenzaprine (muscle relaxant) 10 mg one twice a day, now using the methocarbamol two at bedtime of the 500.
                               \*\* \*\* \*\* \*\* \*\*
SUBJECTIVE/CHIEF COMPLAINT
This is an acute care visit for lower back pain, muscle spasms, <u>has been off of the methocarbamol for a few days, been having tension headaches related to spasms in the shoulders</u>.  She has no alteration of bowel or bladder function.  She has no neuropathy to bilateral lower extremities.  She has muscle spasms radiating in her low back as well.

OBJECTIVE:
Vital signs, temperature 37.3 C, pulse is 100, respiratory rate is 20, blood pressure is 130/85, and weight is 171.8 pounds.  This is a 43-year-old female, alert and oriented times three, pleasant and cooperative with back pain noted with palpation of the low back area with

radiation down to the buttock.  The pain is located in the shoulders with spasms as well.  <u>Pain and spasms in her shoulders and arms, as well as secondary to the fibromyalgia exacerbation and being out of medications</u>.  Further physical examination is deferred at this time.

ASSESSMENT:
1.      Fibromyalgia.
2.      Chronic back pain.
3.      Gastroesophageal reflux disease.
4.      Headache.
5.      Seasonal allergies.

Tr. 114.  The nurse practitioner prescribed Zyrtec for her allergies, Flexeril for muscle spasms,

Nexium for her GERD, increased the methocarbamol dosage to 750 mg, Lortab as needed for

pain, and Phenergan (promethazine hydrochloride) as needed for nausea and vomiting secondary

to headaches.  Tr. 115.  The nurse practitioner referred Chavez to Dr. Qiao.

**B.  ALJ's Step Two Analysis**

At step two of the sequential evaluation process, the claimant bears the burden to

demonstrate that she has a medically severe impairment or combination of impairments that

significantly limits her ability to do basic work activities.[4]  20 C.F.R. §§ 404.1520(c), 416.920(c);

*see also, Bowen v. Yuckert*, 482 U.S. 137, 146 & n.5 (1987); *Eden v.  Barnhart*,109 Fed.Appx.

311, 2004 WL 2051382 (10th Cir. Sept. 15, 2004).  The step two severity determination "is based

on medical factors alone, and . . . does not include consideration of such vocational factors as age,

education, and work experience."  *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cr. 1988); 20

---

[4] Basic work activities include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  20 C.F.R.  § 404.1521.

C.F.R. §§ 404.1520(c), 416.920(c).  In determining whether a severe impairment exists, the

Commissioner considers the "effect" of the impairment.  20 C.F.R.  §416.920(a).

     While Chavez bears the burden of proving her disability, at step two, Chavez is required

only to make a "de minimis showing" that her medically determinable impairments, in

combination, are severe enough to significantly limit her ability to perform work-related activity.

*Williams v. Bowen*, 844 F.2d at 750-51.  Although an impairment is not severe if it has no more

than a minimal effect on an individual's physical or mental abilities to do basic work activities, the

possibility of several such impairments combining to produce a severe impairment must be

considered.  *See* SSR 85-28, 1985 WL 56856, at *3, *4 (1985).  Under 20 C.F.R. §§ 404.1523

and 416. 923, when assessing the severity of whatever impairments an individual may have, the

adjudicator must assess the impact of the combination of those impairments on the person's ability

to function, rather than assess separately the contribution of each impairment to the restriction of

his or her activity as if each impairment existed alone.  *Id.* .

     Although step two requires only a "de minimis" showing, the mere presence of a condition

or ailment documented in the record is not sufficient to prove that the plaintiff is significantly

limited in the ability to do basic work activities, *see Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th

Cir.1997).  To meet her burden, Chavez must furnish medical and other evidence to support her

claim.  *Bowen v. Yuckert*, 482 U.S. at 146 & n.5.

     Chavez asserts the ALJ erred in not finding her depression, anxiety and headaches were

severe impairments.  Mem. in Supp. of Mot. to Reverse and Remand for a Rehearing at 4-7.

According to Chavez, "[t]he ALJ did not perform an adequate evaluation of the severity of these

impairments."  *Id.* at 6.  Chavez contends these impairments have more than a minimal effect on

16

her ability to do basic work activities and were not considered with all of her other medical issues. *Id.* In her decision, the ALJ set forth the standard required at step two of the sequential evaluation process. Tr. 12. Specifically, the ALJ noted: "If a medically severe combination of impairments exists, the combined impact will be considered throughout the disability determination process, **even those that are not severe**." *Id.* (emphasis added). Nonetheless, Chavez contends the ALJ failed to apply this analysis.[5] The Court disagrees.

In her decision, the ALJ found Chavez suffered from "gastroesophageal reflux disease, fibromyalgia, and right lower quadrant abdominal pain, etiology unknown." *Id.* The ALJ found these to be severe impairments. *Id.* Considering the entire record and citing to the agency's consultant's evaluation and opinion, the ALJ found Chavez complaints of anxiety and depression were not severe under the regulations. Tr. 13 ( "Likewise, on September 3, 2004, State Agency psychologist J. LeRoy Gabaldon, Ph.D., concluded that the claimant has no medically determinable mental impairment or severe functional limitation resulting from a mental condition (Exhibit 2F)."). Specifically, the ALJ found:

> The medical records reflect the claimant has been diagnosed with fibromyalgia. She has made complaints of pain in her neck, shoulders, upper and lower back, as well as **occasional headaches** upon examinations. Nevertheless, x-rays of the claimant's lumbosacral spine have been normal, as was a physical examination on July 14, 2005. The claimant's treating physician, Amy L. Robinson, M.D., has recommended physical therapy and increased physical activities to help relieve the claimant's symptoms (Exhibit 9E, page 5). The claimant continued to complain of low back pain, muscle spasms, and headaches on August 1, 2005. Upon physical examination at that time, the claimant exhibited back pain upon palpation of the low back area, with radiation down to the buttock, and pain and spasms in her shoulders and arms. The claimant denied any alteration of bowel or bladder function or neuropathy of her bilateral lower extremities (Exhibit 9E, page 3).

---

[5] Additionally, the ALJ noted she "considered **all symptoms** in accordance with the requirements of 20 C.F.R. §§ 404.1529 and 416.929 and SSRs 96-4p and 96-7p." Tr. 15 (emphasis added).

In light of the medical evidence discussed above, the undersigned concludes that the claimant's GERD, fibromyalgia, and right lower quadrant abdominal pain, etiology unknown, are severe impairments. The evidence clearly demonstrates these conditions have imposed more than minimal limitations on the claimant's ability to perform basic work activities. Conversely, the medical evidence fails to show that the claimant's depression, anxiety, and hypertension impose more than minimal limitations on the claimant's ability to perform basic work activities. These conditions, therefore, are considered to be nonsevere impairments. While the claimant also alleges she is disabled due to migraine headaches, the medical evidence fails to show that she has been diagnosed with this condition. Instead, her treating physicians have concluded that her headaches are tension headaches related to neck and shoulder pain and spasms (Exhibit 9E, pages 3, 6, and 4F, page 72).

Tr. 15. Substantial evidence supports the ALJ's finding that Chavez' depression and anxiety were not severe under the regulations. The record reflects Chavez took Zoloft for her depression. *See* Tr. 179; 114, 253, 256. On April 21, 2004, the attending physician increased the dose to 150 mg and later, on March 31, 2005, the record indicates Chavez was back on Zoloft 100 mg. However, the evidence does not show Chavez ever sought or received treatment for her depression from a mental health care provider, i.e., a psychologist, psychiatrist, counselor, or therapist.

The objective medical evidence also does not support Chavez' claim that she suffers debilitating anxiety attacks. Tr. 87. Chavez completed a Function Report– Adult on July 14, 2004. Tr. 77-84. Chavez listed anxiety as a condition in the Function Report. However, Chavez also indicated she had no problems with her personal care, took care of her 76 year old mother, did the laundry and cooking, did the house work, took care of her pets, and noted she did not need help or encouragement to do these things. Tr. 77-79. Chavez also reported she drove, shopped, read, watched television, talked with her friends on the telephone, and visited with the neighbors about two to three times a week. Tr. 81. Chavez reported she did not have to be reminded to go places and did not need someone to accompany her. *Id.* Significantly, Chavez

answered "none" to the question on the Function Report regarding whether she had experienced any "changes in social activities since the illnesses, injuries, or conditions began."  Tr. 82.

On February 9, 2005, Chavez submitted a Disability Report– Appeal.  Chavez provided the answers and her attorney's secretary filled out the form.  In this report, Chavez reported suicidal thoughts, migraines every other day, depression, anxiety, panic attacks, constant fatigue, stress, and nausea.  Tr. 98.  Chavez reported she now stayed in bed "many days" and now had "no outside activities."  Tr. 102.  Nonetheless, the medical records after February 2005 do not support Chavez' complaints to the degree alleged.  *See* Tr. 256 (March 31, 2005– seen at University Hospital for acute bronchitis; no mention of anxiety, panic attacks, or depression); Tr. 253 (June 13, 2005 visit with Dr. Emil for respiratory problems; no mention of anxiety, panic attacks, or depression);  Tr. 116 (July 14, 2005 evaluation by Dr. Robinson– no mention of suicidal thoughts, migraines, or anxiety); Tr. 114 (August 1, 2005 visit with complaints of lower back pain, muscle spasms, and tension headaches related to spasm spasms in the shoulder; no mention of panic attacks, depression, or suicidal thoughts).  Additionally, the evidence after February 2005 does not indicate that Chavez had sought help from a mental health care provider for her panic attacks, anxiety, or depression.

As to her headaches, the medical record indicates Chavez reported having headaches on July 14, 2005.  Tr. 116-117.  Dr. Robinson diagnosed Chavez with "occasional headaches."  Tr. 117.  Chavez reported she used "promethazine for history of migraine."  Tr. 117.  However, Dr. Robinson diagnosed Chavez with muscle tension headaches.  On August 1, 2005, Chavez reported she had "been having tension headaches related to spasms in the shoulders."  Tr. 114.

The health care provider found Chavez had "[p]ain and spasms in her shoulders and arms, . . . secondary to fibromyalgia exacerbation and being out of medications." *Id.*

Chavez testified she started having migraines "[b]ack in the 80's, [e]arly, mid 80's" and received chiropractic treatment for the "muscle tension in the upper back" which made "the migraines [ ] go away for a while" but "the tension [ ]never went away." Tr. 281. Chavez also testified her migraines came back "around '95 again and then they started coming back in 2000." Tr. 282. Chavez testified stress triggered her headaches and sometimes "for no reason [she] get[s] one." *Id.* The ALJ considered all symptoms (Tr. 15), including Chavez' complaints of headaches, and found Chavez' "medically determinable impairments could reasonably be expected to produce the alleged symptoms," but not to the degree alleged (Tr. 16).

The Court has meticulously reviewed the medical record and finds that substantial evidence supports the ALJ's conclusion that the evidence did not support Chavez' claim that her headaches were as debilitating as she claimed. The Court notes that on **May 18, 2004**, a health care provider referred Chavez to the UNM Pain Clinic and provided Chavez with the clinic's number. Tr. 151. However, at the **August 15, 2005** administrative hearing, over a year since the referral to the Pain Clinic, Chavez had not been to the Pain Clinic and "was still waiting for an appointment to the [UNM] pain center." Tr. 285. This belies Chavez' claim that her pain from her fibromyalgia, right lower quadrant abdominal pain, and headaches was "severe" or "excruciating" or "debilitating."

## C.  Credibility Determination

Credibility determinations are peculiarly the province of the finder of fact and will not be upset when supported by substantial evidence. *Diaz v. Secretary of Health and Human Servs.*,

898 F.2d 774, 777 (10th Cir. 1990). "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988). However, the ALJ's credibility determination does not require a formalistic factor-by-factor recitation of the evidence. *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). The ALJ need only set forth the specific evidence he relies on in evaluating claimant's credibility. *Id.* The ALJ may also consider his personal observations of the claimant in his overall evaluation of the claimant's credibility. *Id.*

In evaluating a claimant's credibility regarding pain, the ALJ must consider the level of medication the claimant uses and its effectiveness, the claimant's attempts to obtain relief, the frequency of medical contacts, the claimant's daily activities, subjective measures of the claimant's credibility, "and the consistency or compatibility of nonmedical testimony with objective medical evidence. *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir 1995). The inability to work pain-free is not sufficient reason to find a claimant disabled. *See Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988).

In her decision, the ALJ found as follows:

Upon careful consideration of the <u>entire record</u>, the undersigned finds that the claimant has the residual functional capacity to perform a full range of sedentary work activities that requires lifting of no more than a maximum of ten pounds at a time, occasional lifting or carrying, prolonged sitting, occasional walking and standing, and a good use of hands and fingers for repetitive hand-finger actions and fine manipulation.

In making this assessment, the undersigned considered <u>all symptoms</u> in accordance with the requirements of 20 C.F.R. §§ 404.1529 and 416.929 and SSRs 96-4 and 97-7p. The undersigned <u>also considered opinion evidence</u> in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927 and SSRs 96-2p, 96-5p and 96-6p.

Upon considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms. However, the claimant's statements concerning the intensity, duration and limiting effects of

these symptoms are not entirely credible.  Specifically the medical evidence shows that conservative treatment and prescribed medications have worked well to control the claimant's symptoms (Exhibits 4F, pages 18, 31, and 63).

A thorough review of the record also reveals there have been times during which the claimant has not been entirely compliant in taking her medications as prescribed (Exhibits 4F, page 45 and 9E, page 3), which suggests that the claimant's medical condition is not as severe as she has attempted to portray in connection with this appeal. Further suggesting that the claimant's medical condition is not as severe as she alleges, she did not immediately pursue physical therapy to help relieve her symptoms of fibromyalgia as recommended by her treating physician on July 14, 2005 (Exhibit 9E, page 5).  At the hearing, the claimant testified that she was finally going to see a physical therapist on October 3, 2005.

The claimant has described daily activities which are not limited to the extent one would expect, given her complaints of disabling symptoms and limitations.  Treatment records dated January 12, 2004 and February 24, 2004, indicate that the claimant is the caretaker for her mother, a duty which requires her to perform heavy lifting (Exhibit 4F, pages 38, 44).  At the hearing, the claimant again informed that she takes care of her mother, which can be quite demanding both physically and emotionally, without any particular assistance.  The claimant testified that a typical day for her includes cooking and cleaning.  She further testified that she is able to drive to run errands, shop for groceries, and attend doctor appointments.  I do not find my assessment of the claimant's residual functional capacity inconsistent with her daily activities.

Accordingly, I find the claimant retains a residual functional capacity to perform a full range of sedentary work activities.  This determination is consistent with the opinions of State Agency medical consultants who have also found the claimant is not disabled (Exhibit 1F and 2F).  As the opinion of non-examining, non-treating physicians, their opinions are not entitled to controlling weight, but must be considered

Tr. 16 (emphasis added).   The ALJ's assessment of Chavez' credibility is legally sufficient

because the ALJ gave specific reasons for rejecting her subjective complaints.  *See White v.*

*Barnhart*, 287 F.3d 903, 909 (10th Cir. 2001).  In making her credibility determination, the ALJ

relied on the treatment Chavez received and the frequency of that treatment, Chavez'

noncompliance with the prescribed treatment, Chavez' failure to pursue prescribed treatment,

Chavez' daily activities, and the fact that Chavez was solely responsible for her mother's care.

The ALJ also considered the opinions of the agency's medical consultants.  Moreover, the

evidence shows that no treating physician had restricted Chavez' activities in any way.

Accordingly, the Court will not disturb the ALJ's credibility findings.

**D.  ALJ's RFC Determination**

Chavez claims the ALJ's RFC determination is not supported by the evidence.

Specifically, Chavez contends the ALJ erred in his RFC determination because she "did not

include any limitations from Chavez' nonexertional impairments."  Pl.'s Mem. in Support of Mot.

to Reverse at 7.  The ALJ found:

> Vocational expert testimony establishes that the claimant is capable of performing past
> relevant work as an accounts receivable clerk, a credit collector's clerk, and an administrative
> officer.  This work does not require the performance of work-related activities precluded by
> the claimant's residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965).
>
> In comparing the claimants' residual functional capacity with the physical and mental
> demands of this work, the undersigned finds that the claimant is able to perform it as it was
> performed and as it is generally performed.  As explained by the vocational expert, the
> claimant's past relevant work did not require the claimant to lift or carry objects weighing
> more than 10 pounds.

Tr. 15.  At the hearing, the ALJ asked the vocational expert (VE) the following:

ALJ:   How would you characterize the claimant's past relevant work?

VE:    Yes, Your Honor she was an inventory control representative that job is classified as light

work and semi-skilled with an SVP of 4.  **Accounts receivable clerk** that job is classified

as sedentary work and that's how she performed it and it's a skilled job with an SVP of 6.

Okay, accounts receivable and then, **credit collections clerk**, that job is classified as

sedentary work and semi-skilled with an SVP of 4.  And then she did two, she was

a**dministrative office manager** and an **office supervisor** and those jobs are classified as

sedentary work and that's how she performed them and skilled with an SVP of 6.  And

accounts receivable, did I say that was skilled or semi, or did I say?

ALJ:   You didn't say.

VE:    Yeah, okay.  That's it's skilled with an SVP of 6, sorry.

** ** ** ** **

ALJ:   I have a hypothetical person for you to give me some information about.  Let's assume that we, this hypothetical person has the same work experience, age, and education as our claimant.  And further assume the sedentary exertional restrictions.  That's my first hypothetical.  Can this person do the claimant's past relevant work.

VE:   Yes, your Honor, all the past relevant work.

ALJ:   Okay.

VE:   Oh, no, except for the inventory control.

ALJ:   Okay.  Would you explain your answer?

VE:   Yes, the, the inventory control required her to lift between 10 to 20 pounds and stand and walk.  The other positions, the accounts receivable, administrative manager, collections, were sedentary jobs and she documented that all those jobs were 10 pounds and she [had] to sit between seven and eight hours out of an eight hour day and had to handle, write, and type seven hours out of an eight hour day.

ALJ:    Okay.  Another hypothetical regarding past relevant work.  Let's assume that the same individual with the sedentary exertional limitations, this individual has, can only type for approximately one hour at a time without having to stop because of the pain in the shoulders and arms.  Further, the individual can sit for a maximum of two hours a day, stand for a maximum of one hour a day.  Assuming that this individual must get up and move around, rather sitting or standing because of pain in the shoulders, back, legs, and that the individual can lift or carry a maximum of 15 pounds occasionally and frequently, could this individual do the claimant's past relevant work?

25

VE:     No, your Honor.

ALJ:    And could you explain your answer.

VE:      Yes.  She had documented that in every job she had she had to type or do date [data?]

entry more than one hour at one time and the sitting, of course, as I explained earlier, was,

you know, between seven and eight hours out of an eight hour day and your hypothetical

said two out of eight and she was not allowed to alternate sit and stand due to pain.

ALJ:    Okay.  All right.  Let's talk about the other work.

Tr. 294-297.

The ALJ, based on her credibility determination, found Chavez was not precluded from

performing the jobs of accounts receivable clerk, credit collector's clerk, and an administrative

officer.  Tr. 16.  Chavez objects to the ALJ not adopting the VE's response to the ALJ's second

hypothetical.  However, a hypothetical question need not take into account all of claimant's

alleged impairments.  Questions to VE are proper when they take into account the impairments

substantiated by the medical reports and the impairments accepted as true by the ALJ.  *See Gay v.*

*Sullivan,* 986 F.2d 1336, 1340-41 (10th Cir. 1993); *Talley v. Sullivan*, 908 F.2d 585, 588 (10th

Cir. 1990).  The ALJ did not adopt the VE's response to the second hypothetical since she had

not accepted as true Chavez' claim that she could only type for approximately one hour at a time

without having to stop because of the pain in the shoulders and arms, could only sit for a

maximum of two hours a day, stand for a maximum of one hour a day, and had to get up and

move around.  Accordingly, the ALJ was not bound by the VE's response to the ALJ's second

hypothetical.  Moreover, the ALJ set forth the evidence (Tr. 15-16) she relied upon to find

Chavez retained the RFC to perform "a full range of sedentary work activities."  Tr. 16.  The

Court has reviewed the entire record and finds that substantial evidence supports the ALJ's RFC determination.

**E.  Conclusion**

It is not this Court's role on appeal from this agency determination to reweigh the evidence or to substitute its judgment for that of the Commissioner.  *See Hargis v. Sullivan*, 945 F.2d 1482, 1486 (10th Cir. 1991).  The Court's role is to review the record to ensure that the ALJ's decision is supported by substantial evidence and that the law has been properly applied.  Thus, in light of the narrow scope of the Court's review, the Court is satisfied that substantial evidence supports the ALJ's determination that, despite her limitations, Chavez retained the RFC to perform sedentary work and thus she could return to her past relevant work.

A judgment in accordance with this Memorandum Opinion will be entered.

_____

**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**